*Decision will be entered under Rule 50.*

DAVID SCHNUR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6619. Promulgated February 4, 1948.

*L. Herman Sher, Esq.,* and *Martin A. Roeder, Esq.,* for the petitioner. *William F. Evans, Esq.,* for the respondent.

OPINION.

ARNOLD, *Judge*: The issue presented is whether petitioner, a resident alien, had war losses deductible under section 127, Internal Revenue Code, the pertinent portions of which are set forth in the margin.[1]

---

[1] Section 127, Internal Revenue Code, as added by section 156 (a) and (b), Revenue Act of 1942:

"SEC. 127. WAR LOSSES.

"(a) CASES IN WHICH LOSS DEEMED ·SUSTAINED, AND TIME DEEMED SUSTAINED.—For the purposes of this chapter—

"(1) * * *

"(2) PROPERTY IN ENEMY COUNTRIES.—Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States.

* * * * * * *

"(b) AMOUNT OF LOSS ON DESTROYED OR SEIZED PROPERTY.—In the case of any property or interest in or with respect to property deemed to be destroyed or seized under subsection (a)—

"(1) The amount of loss on account of such property or interest shall be determined with regard to any recoveries with respect thereto in the taxable year but without regard to any possibility of recovering such property or interest, or of receiving any compensation

Respondent's contentions, stated in reverse order, are: First, that a resident alien who is a citizen of a neutral country is not entitled to the benefit of section 127, Internal Revenue Code; second, that, if entitled to the benefit of section 127, he has failed to sustain his burden of proof; and finally, that petitioner has failed to meet the requirements of section 127 to establish the losses claimed.

Respondent's first contention rests upon the argument that Congress, in enacting section 127, did not intend to extend the deduction to one who was a citizen of a neutral country; that as a Spanish citizen petitioner had no property in "an enemy country" within the meaning of section 127; that the declaration of war in no way changed petitioner's status or affected his properties in France and Holland; that so far as the enemies of this country were concerned he would still be regarded as a citizen of a neutral country; that it was extremely unlikely that an enemy country would know of his residence in the United States; that the statute can not be said, therefore, to apply to a resident alien who is a citizen of Spain, a neutral country; and that, even though the alien is taxed as a citizen is taxed, it was not the intent of Congress to give resident alien taxpayers the benefit of section 127.

We can not agree with this interpretation of the taxing statute. The code imposes a tax upon the net income of "every individual"; it makes no distinction between a citizen and a resident alien. Secs. 11 and 12, I. R. C. The respondent's regulations are to the same effect. They state that citizens, "wherever resident, are liable to the tax," and that "Every resident alien individual is liable to the tax, even though his income is wholly from sources outside the United States. As to nonresident alien individuals, see sections 211 to 219, inclusive." Section 19.11–2, Regulations 103. Section 19.211–1 of Regulations 103 specifically states that "Resident aliens are in general taxable the same as citizens of the United States, that is, a resident alien is taxable on income derived from all sources, including sources without the United States." Supplement H of the code, sections 211 *et seq.*, treats nonresident aliens as a separate class of taxpayers, thereby indicating the fact that under the code citizens and resident alien taxpayers are to be treated the same for income tax purposes. Section 19.211–2 of respondent's Regulations 103, in distinguishing between resident alien and nonresident alien taxpayers, states: "An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax." Section 19.211–2

---

(other than insurance or similar indemnity) on account of such property or interest in the taxable year or in any future taxable year.

    *     *     *     *     *     *     *

"No loss shall be deemed to have been sustained upon the destruction or seizure of such property or interest to the extent that it is compensated for by the discharge or satisfaction of obligations and liabilities of the taxpayer out of such property or interest in the taxable year in which such destruction or seizure is deemed to have occurred. * * *"

Section 156 (b), Revenue Act of 1942, made section 127, Internal Revenue Code, retroactive to taxable years beginning after December 31, 1940.

also provides that, if an alien makes an extended stay to accomplish his purpose in coming to the United States and to that end makes his home temporarily in this country, he becomes a resident, even though he intends at all times to return to his domicile when his mission is accomplished.

Section 127 was a new provision written into the code by the Congress when it passed the Revenue Act of 1942. By this amendment to the code the Congress provided "practical rules for the treatment of property destroyed or seized in the course of military or naval operations during the war, and of property located in enemy countries or in areas which come under the control of the enemy." Senate Finance Committee Report on The Revenue Bill of 1942, being Senate Report No. 1631, 77th Cong., 2d sess., sec. 158 War Losses. The section, as enacted into the code (section 156), and the committee report speak of the "taxpayer" without distinguishing between a citizen and a resident alien taxpayer. The petitioner is a taxpayer. He has actually resided in this country since 1939. In May of the taxable year he reentered this country from Mexico as a quota immigrant, and subsequently became a naturalized citizen. We can see no basis under these facts for treating this taxpayer differently for tax purposes from a citizen of this country.

In *Eric H. Heckett*, 8 T. C. 841, we had a very similar situation. Heckett, a citizen of the Netherlands, came to this country in February 1939, and has since resided here. He became a naturalized citizen in June 1945. During the taxable year 1941 Heckett, like this taxpayer, was a resident alien. Unlike petitioner, Heckett was a citizen of a country invaded by Germany and not a citizen of a neutral country. Each had personal property in an area overrun by the Germans. Each was a resident alien taxpayer of this country in 1941. The Germans did not seize, destroy, or interfere with the property of either prior to the declaration of war on Germany. We held in the *Heckett* case that the taxpayer sustained a war loss under section 127. Can it be said that Schnur should be treated differently from Heckett solely upon the grounds of citizenship? We think not. The citizenship of a resident alien is, in our opinion, immaterial. The controlling factors are whether the individual is a taxpayer, and whether he in fact sustained war losses within the meaning of section 127, Internal Revenue Code.

The immateriality of a citizenship test for the application of section 127 is further demonstrated by our decision in *Eugene Houdry*, 7 T. C. 666. Houdry was a resident alien residing at Ardmore, Pennsylvania. Prior to May 1941 he was a citizen of France. In that month his citizenship was abrogated by the Vichy Government. Nevertheless, we held he was entitled to a loss deduction either pursuant to section 127 or to *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398, and

we pointed out in our opinion, p. 669, that "There is no suggestion that petitioner's status as a resident alien grants or subjects him to different treatment from that of a citizen." See also, *Ernest Adler*, 8 T. C. 726, whose German citizenship was revoked in 1938 and who had no citizenship when he came to the United States in January 1941.

It should also be noted that section 23 (e), Internal Revenue Code, which grants casualty loss deductions to individuals, makes no distinction between citizen taxpayers and resident alien taxpayers, whereas section 213 (b) (2) limits casualty loss deductions of nonresident aliens to property within the United States.

Respondent's second contention raises the question of the sufficiency of petitioner's proof. For petitioner to prevail his proof must show: (1) That the property was in existence and owned by him on the date war was declared; (2) the cost of such property, properly adjusted for depreciation to the basis date. *Benjamin Abraham*, 9 T. C. 222, 225; *Ernest Adler, supra; Eric H. Heckett, supra*.

Our findings show that on December 11, 1941, petitioner owned certain German bonds and certain real property. Prior and subsequent to December 11, 1941, the German bonds were in the office of petitioner's stockbroker in Amsterdam, Holland. The bonds were not seized, confiscated, or destroyed by the Germans before or after December 11, 1941, but remained and continued to remain in the custody of the stockbrokers up to the date of the hearing in this case in April 1947. So far as this personal property is concerned, it was never out of the possession of petitioner's stockbroker from the dates of purchase until the hearing in this case. The existence of the bonds can not therefore be doubted, nor can their ownership, for petitioner's stockbroker personally testified to his ownership of said bonds.

With respect to the real property, our findings show the cost and dates of acquisition, and that extensive improvements were made to the country estate following its acquisition. In fixing the dollar cost of the improvements we have used the lowest value of the French franc in terms of the United States dollar for the period between acquisition and the end of the year in which petitioner left France for the United States. It is reasonable to believe that the improvements cost more than the amount we have found, since such improvements were undoubtedly completed prior to the petitioner's departure for the United States. Our findings further show that the real properties were in the hands of caretakers placed there by petitioner, and were still in their hands in 1946. Such proof was held sufficient to establish the existence and ownership of real property when war was declared, in *Benjamin Abraham, supra*, and is equally sufficient here.

In the latter case we approximated Abraham's war loss because the evidence did not give the dates of the improvements or any other data by which we could determine with any degree of accuracy the de-

preciation that took place up to December 11, 1941. If we used the same figure of 50 per cent there used, petitioner's war loss here would be in excess of $96,000 on his real properties.

We have found as a fact that on December 11, 1941, petitioner owned German bonds that had cost him in excess of $76,000. In addition, he owned 3 per cent funding bonds issued by the Conversion Office for German Foreign Debts, which the amended petition alleged had a value at December 11, 1941, in excess of $57,000. The funding bonds were issued to petitioner in lieu of cash for interest due him on his German bonds and mortgage. The cost of the funding bonds to petitioner, therefore, was their value when paid to him in lieu of interest due. We have found the face value of the funding bonds in United States dollars, Dutch guilders, and German reichsmarks. We have made no finding as to the value of the funding bonds in terms of United States dollars when the bonds were acquired, but we have found as a fact that they had value when acquired, at the time war was declared on Germany, and in January 1942. Even though petitioner has established that the funding bonds, like his other German bonds and his real property, had value at December 11, 1941, we deem it unnecessary for the purposes of this case to determine petitioner's cost basis or the exact value of the funding bonds at December 11, 1941, since in any event the loss sustained on his other German bonds and his real property is sufficient to establish the war loss deduction of $100,000 alleged in his amended petition.

Respondent argues on this point that petitioner offered no evidence in respect of the underlying assets of the German corporations issuing the securities except testimony that they were bonds of German municipalities and German industrial corporations. It is suggested that the Germans may well have seized the underlying assets as early as the fall of 1939, and that, as to the German industrial corporations, such corporations may well have owned assets in neutral countries, so that no loss would be allowable under section 127. This argument appears to be *contra* to respondent's own regulations. Petitioner claims a deductible loss under section 127 (a) (2), which relates to property within any country at war with the United States or within an area under the control of any such country. The German bonds were intangible property within an area under the control of Germany at the time war was declared. The intangible property in question existed by reason of the law and authority of Germany, and respondent's regulations state that section 127 (a) (2) applies where this situation exists. As an example of intangible property to which section 127 (a) (2) applies, his Regulations 103, as added by T. D. 5258, C. B. 1943, p. 415, give the following examples:

For example, all public bonds of a country at war with the United States are considered to be within the provisions of section 127 (a) (2); * * * Any

interest in a corporation *chartered* by a country at war with the United States will be considered intangible property located in the enemy country unless the taxpayer has any rights to assets of such corporation not treated as destroyed or seized under section 127, * * * [Emphasis supplied.]

See also *Robert E. Ford*, 6 T. C. 499, 503.

Respondent's contention that petitioner has failed to meet the requirements of section 127 is addressed primarily to the proof offered with respect to petitioner's alleged deposit with the Reichskreditgesellschaft in Berlin. Our findings show that petitioner had sums on deposit with this bank during the taxable year. The petitioner's testimony indicates that the deposit was substantial in amount during the first part of the taxable year, but the amount on deposit, if any, at the date war was declared on Germany was not established. We were unable, therefore, to make any finding of the amount of petitioner's alleged deposit on December 11, 1941. On this question we agree with respondent that petitioner has failed to meet the requirements of section 127, Internal Revenue Code.

In view of our determination that petitioner sustained war losses with respect to certain personal *and* real property aggregating at least $100,000, as alleged in his amended petition, petitioner is entitled to a refund of a portion or all of the income taxes paid for 1941. In this connection it should be remembered that when petitioner filed his 1941 tax returns he had no statutory right to a war loss deduction. This deduction was provided for by section 156 (a), Revenue Act of 1942, enacted in October 1942 and made retroactive to taxable years beginning after December 31, 1940, by section 156 (b), Revenue Act of 1942. Claim for refund having been made by petitioner, the amount of his overpayment will be determined under Rule 50 in accordance herewith.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

VAN FOSSAN, *J.*, dissents.